(108 So. 770)

No. 27509.

STATE ex rel. TALLANT v. BOARD OF COM'RS OF THE PORT OF NEW ORLEANS.

(May 3, 1926. Rehearing Denied May 31, 1926.)

*(Syllabus by Editorial Staff.)*

1. **Municipal corporations ⬤⟳1—Board of Commissioners of port of New Orleans is "state agency," administering public property for benefit of port (Act No. 70 of 1896).**

Board of commissioners of the port of New Orleans, created by Act No. 70 of 1896, is not a corporation, but a "state agency," administering public property to advance prosperity of the port.

2. **Municipal corporations ⬤⟳218(7)—Demotion of chief yard clerk of port of New Orleans held to violate Civil Service Act requiring removal only after trial (Act No. 15 of Extra Session of 1915, § 5; Const. 1913, arts. 75, 322).**

Demotion of chief yard clerk of port of New Orleans, appointed to such position under civil service provisions of Act No. 15 of Extra Session of 1915, authorized under Const. 1913, arts. 75, 322, to clerical position at less salary, *held* to violate section 5 of the Act of 1915, providing for removal only on charges preferred against employee and trial thereof.

3. **Municipal corporations ⬤⟳218(7)—Indefinite suspension without pay or demotion at reduction in salary amounted to "removal" of chief yard clerk of port of New Orleans, appointed under civil service (Act No. 15 of Extra Session of 1915).**

Indefinite suspension without pay, or demotion with reduction in salary, of chief yard clerk at port of New Orleans, appointed under civil service provisions of Act No. 15 of Extra Session of 1915, amounted to a "removal" of clerk.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Remove —Removal.]

4. **Municipal corporations ⬤⟳218(1) — Public boards and commissions may remove their employees only in manner permitted by law.**

Public boards and commissions may remove their employees only in manner permitted by law and not otherwise, even though for good of the service.

Appeal from Civil District Court, Parish of Orleans; Hugh C. Cage, Judge.

Mandamus by the State of Louisiana, on the relation of Drury J. Tallant, against the Board of Commissioners of the Port of New Orleans. Decree for petitioner, and defendant appeals. Affirmed.

Harold A. Moise, of New Orleans, for appellant.

Merrick & Schwarz and William J. Guste, Trial Atty., all of New Orleans, for appellee.

ST. PAUL, J. In the preamble to Act 70 of 1896, p. 102, the people of the state of Louisiana, through their representatives in General Assembly convened (quorum pars magna fui), recognized and published the fact that the port of New Orleans had been gradually *extended* until it had reached beyond the limits and jurisdiction of the city of New Orleans; but that the divided authority of three parishes (Orleans, Jefferson, and St. Bernard) and the multiplicity of officials, with their various fees and charges, were operating to injure the traffic of said port, by imposing a tax on shipping of such proportions as threatened to divert the trade thereof to less expensive shipping points and foster the development of rival ports.

Whereupon they declared (as indeed they *hoped*) that the supervision and control of *"an intelligent board of state commissioners"* could consolidate the services of all these various harbor masters, port wardens, wharf superintendents, and wharfingers, into one set of *competent employees* at reduced expense; could operate the wharves and terminal facilities of said port at reduced cost; could remove the many obstacles that then stood in the way of the port's advancement (principally *politics*, though not mentioned eo nomine); and could thus "greatly develop and expand its commerce."

And thereupon the General Assembly, by said Act No. 70 of 1896, amended by Act 36

of 1900 and Act 14 of 1915 (Ex. Sess.), took over, for the state, all the facilities of the harbor and port of New Orleans, and gave the regulation, control and management of the commerce of that great port (extending through and into the parishes of Orleans, Jefferson, and St. Bernard) to a *state commission* (the members thereof to be appointed by the Governor of the state), as a *state agency* to administer the aforesaid *public property*. Cf. Duffy v. City of New Orleans, 49 La. Ann. 114, 21 So. 179.

## I.

The commission thus created is the "board of Commissioners of the port of New Orleans," the defendant here.

[1] And we make mention of the purpose of its creation, of its *status*, and of the nature of the property under its administration to the end that it may be observed that defendant is *not* a corporation but a mere *state agency;* that the property under its administration is *not* its own but *public property;* that the purpose for which defendant was created was to "remove the obstacles" in the way of the advancement and prosperity of the port of New Orleans and lighten the burden on its commerce *by reducing expenses and selecting competent employees.* So that when the General Assembly of the state (now "the Legislature") deals with the affairs of the board of commissioners of the port of New Orleans, it is as a master speaking to his servant with respect to that which is the master's own. Its commands in such matters *transcend*, as it were, the domain of ordinary legislation; it then speaks with *dual authority*, that of sovereign and that of master. Cf. Lacoste v. Department of Conservation, 151 La. 909, 92 So. 381. Which will assist materially to a clearer understanding of the matter before us.

## II.

At an Extraordinary Session held in the year 1915, and called for *that express purpose*, among others (see Const. 1913, art. 75), the General Assembly took such steps as it thought necessary (and hoped would prove effective) to secure in a measure the "*competent employees*" which the defendant was alone expected to maintain. It passed Act No. 15 of 1915 (Ex. Sess.) p. 37, by which it provided certain civil service regulations for the employment of persons in the warehouses and other structures authorized by article 322 of the Constitution of 1913. A "board of examiners" was created, on whose recommendation only such persons were to be employed, "save and except * * * watchmen, patrolmen, firemen, and unskilled laborers drawing $75 per month or less," and excepting also, samplers, weighers, and inspectors of cotton, to be recommended by the New Orleans Cotton Exchange, and (probably) professional persons and other experts employed only for some special service or for a limited time.

And so intent was the General Assembly that the act should be observed *in spirit* as well as in form, that it denied to the board of port commissioners the right to name the (three) members of the board of examiners; these were to be appointed by the Governor of the state, one on the recommendation of the New Orleans Cotton Exchange, one on the recommendation of the New Orleans Board of Trade, and the third alone on the recommendation of the board of port commissioners.

And in furtherance of the intent to have the board of port commissioners not only secure but also *retain* "competent employees," the act provided in the very *final clause* thereof (legislator's last thought) that:

"They (the employees appointed in accordance with the recommendation of the examiners) shall only be removed on charges preferred against them to said Board of Commissioners, and which shall be proven contradictorily against them to the satisfaction of said Board."

It is, however, one thing to command, but quite another to be obeyed willingly. See State ex rel. Sonnenberg v. Board of Com'rs of Port of New Orleans, 149 La. 1095, 90 So. 417; State ex rel. Hughes v. Board of Com'rs of Port of New Orleans, 150 La. 1, 90 So. 419; State ex rel. Exnicios v. Board of Com'rs of Port of New Orleans, 153 La. 705, 96 So. 539; State ex rel. Skelly v. Board of Com'rs of Port of New Orleans, 159 La. 465, 105 So. 510.

### III.

The case now before us is thus stated and disposed of by the district judge, whose opinion accords with the law as set forth above and the jurisprudence as established in the cases last above cited, and we now adopt it as our own, as follows, viz.:

### "Opinion of the District Judge.

"Cage, District Judge. The relator, who held the position of unit clerk of shed L of the cotton warehouse in this city, owned [by the people of the state of Louisiana] and operated by the respondent, was removed from that position under a so-called indefinite suspension, and was [thereafter] tendered a clerical position at a salary of $150 a month, whereas he had been receiving in the position held by him $241 per month. He seeks by way of mandamus to be reinstated in his position and to have paid to him the salary which he would have earned had it not been for his suspension or removal.

"The law of this case is found in Act 15 of the Acts of the Extraordinary Session for the year of 1915. That act provides for the creation of a board of examiners to act as a civil service commission, and of a civil service for the employees of the board of commissioners of the port of New Orleans, commonly called the dock board, who are employed in the warehouses and other structures owned [by the people of the state of Louisiana] and operated by the said dock board, in this city.

"The act creating the examining board gives it authority to establish rules and regulations for its guidance, but the crux of this whole case is embraced in the last sentence of section 5 of the act, which reads as follows: 'They (employees and appointees under civil service) shall hold their offices or employment during good behavior, and shall only be removed on charges preferred against them to said board of commissioners, and which shall be proven contradictory against them to the satisfaction of said board.'

"The record shows that under the law which I have just referred to and the regulations of the board of examiners, the relator, in July, 1915, made application to the board of examiners to be examined for the position of shipping or receiving clerk, in the employment of the dock board; that he took the examination and passed with a general average of 85 per cent. and was certified on August 17, 1917, and was thereupon employed by the board as receiving and/or shipping clerk, and continued to hold this position until there arose a vacancy in the position known as chief yard clerk in the cotton warehouse; that the officials of the dock board designated the relator to fill the position of chief yard clerk until there could be an examination held and a lawful appointment made. This took place in the latter part of October or the first part of November, 1916, and on the 4th day of November, 1916, the relator made formal application to the board of examiners 'to be examined for the position to chief yard clerk.' He was so examined and passed with general average of 93 per cent., and thereupon received the appointment of chief yard clerk.

[2] "It now appears that in common parlance the chief yard clerks came to be designated as clerk of unit A, or B, or C, etc., and that the relator was designated as unit clerk of shed L; but there appears to be no such official designation known, and the real and true designation of each of these unit clerks is chief yard clerk; for which position each of them took the civil service examination. It is therefore plain, that when on the 3d of March of this year, 1925, the relator was indefinitely suspended from the position of unit clerk of shed L, he was in truth and in fact indefinitely suspended from the position he had won, and which belonged to him, of chief yard clerk; and the tender to him of a clerical position at $150 a month, which he was given the choice of accepting, or being removed from the service altogether, was a clear violation of the legislative act and of the rules and regulations of the board of commissioners.

"The defense is made that the relator was simply certified for a clerical position or as a clerk, and that under the law and the rules, the dock board had the right to transfer those parties holding clerical positions from one position to another, to promote or demote them, or to increase or decrease their salaries. This defense to my mind is totally untenable. The record shows that when the relator obtained the position of chief yard clerk in the manner

which I have designated it was deemed by the respondent a distinct position; and the respondent had no right to appoint the relator until he had taken the civil service examination and had been recommended to it by the board of examiners for the position.

"Whether the chief yard clerks should or should not fall under clerical subdivision 1 [of the civil service rules and regulations] is, in my opinion, absolutely inconsequential. The fact is, however, that the office or employment of chief yard clerk is one of the positions designated under subdivision 1 of the clerical classification. And I am therefore of the opinion that, under the law and under the very rules and regulations of the board of examiners, the relator could not be removed from the position of chief yard clerk unless and until charges were preferred against him and he had a trial before the board of commissioners, and the verity of the charges and the availability of them to justify his removal had, contradictorily with him, been established to the entire satisfaction of the said board of commissioners.

"For these reasons the alternative writ of mandamus heretofore issued will now be made peremptory [and judgment accordingly]."

### IV.

[3] It may be added that an indefinite suspension without pay simply amounts to *a removal*, and that a *demotion*, so far as it carries with it a reduction of salary, is only an indirect method of attaining the same end. For, if a civil service employee may be "demoted" once and his salary thus substantially reduced, he may of course be "demoted" again and his salary still further reduced, or (say) until it vanishes altogether.

[4] Public boards and commissions may remove their employees only in the manner permitted by law. They cannot remove them otherwise, even for the alleged "good of the service." Jones v. City of New Orleans et al., 160 La. 645, 107 So. 476.

### Decree.

The judgment appealed from is therefore affirmed.

O'NIELL, C. J., takes no part, not having heard the argument.